#108    KTL\nh    8/19/2014                                                                                    2004S-0322

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

HELEN MONROE, Administrator of the
Estate of REGINA ROMERO, Deceased,

                                    Plaintiff,

                                                        No.    04 CV 7358

                        v.

UNITED STATES OF AMERICA,

                                    Defendant.

## PLAINTIFF'S ANALYSIS OF
## COMPARABLE VERDICTS

In this medical negligence action, the plaintiff seeks damages for Regina Romero's

conscious physical pain and mental suffering, disability and disfigurement under the Illinois

Survival Act, 755 ILCS 5/27-6, and for the loss of society suffered by Mrs. Romero's children,

Gilbert and Christina, pursuant to the Illinois Wrongful Death Act, 740 ILCS 8/1, et. seq. The

plaintiff, Helen Monroe, the mother of the decedent, is the duly-appointed administrator of the

Estate of Regina Romero. Mrs. Monroe is not a beneficiary of either the wrongful death or

survival actions.

The United States Court of Appeals for the Seventh Judicial Circuit has suggested in

*dicta* that fact-finders in FTCA cases should look to "comparable" verdicts in determining non-

economic damage awards. *Jutzi-Johnson v. United States*, 263 F. 3d. 753 (7th Cir. 2001). The

Seventh Circuit has not, however, discussed what types of "evidence" of comparable verdicts are

acceptable. The only materials reasonably available to litigants are reported decisions from other

cases or reports from commercial publications such as the *Cook County Jury Verdict Reporter*.
*Zurba v. United States*, 247 F. Supp. 2d. 951 (N. D. Ill. 2001).

Any of this "evidence" carries inherent limitations. No appellate decision or report of a
verdict can replicate the detail and flavor of the evidence the jury actually heard. *Id.* at 961.
Thus, evidence of comparable verdicts should be used as a general guideline and should never act
as a *de facto* cap on damages. Fed. R. Civ. P. 52(a) requires judges, when they act as fact-
finders, to make written findings in support of their conclusions. When the issue is damages, the
judge must indicate the reasoning process that connects the evidence of the harm suffered to the
conclusion reached by the judge. *Jutzi-Johnson*, 263 F. 3d. 753, 758. There is no authority for
the proposition that a damage award must mimic any specific reported verdict or that it must be
less than any specific reported verdict. Illinois substantive law, which applies to this case,
prohibits the use of other verdicts or settlements by the fact -finder or the reviewing courts.
*Richardson v. Chapman*, 175 Ill. 2d. 98 (1997).

The Seventh Circuit has also suggested - but not mandated - a "ratio" approach to
assessing non-economic damages. *Arpin v. United States*, 521 F.3d. 769 (7th Cir. 2008). This
approach would tie non-economic damages to economic damages. *Id.* The "inevitable result" of
such a "plug and chug approach," however, would be a body of law that establishes that higher
income people have more valuable relationships with loved ones than lower earners. *Casan v.
Holmes Transport*, 2009 U.S. Dist. LEXIS 1142887 (S.D. Ill. 2009). Further, those who run up
enormous medical bills before dying will leave loved ones whose grief is somehow worth more
than those who die instantly. *Id.* The extreme example is the unemployed person who dies
without medical bills: "Anything times zero is zero." *Id.* at 8. Where, as in the present case,

2

economic loss has nothing to do with loss of society, the ratio approach is inappropriate. *Id.* at 9, *see also Hardnick v. United States*, 2009 U.S. Dist. LEXIS 53739 (N. D. Ill. 2009) (ratio approach does not make sense in a case involving only non-economic damages).

A.      **Survival Act**

The Illinois survival Act allows a representative of the decedent to maintain statutory and common-law actions that had accrued to the decedent before death. *McKinnis v. United States,* 2008 U.S. LEXIS 100735 (N.D. Ill. 2008); 755 ILCS 5/27-6.  A survival action allows for the recovery of damages for injuries personally sustained by the decedent up to the time of her death. *Id.*  Under Illinois law, the damages relevant in the present case include physical pain and mental suffering, disability/loss of a normal life and disfigurement.  Illinois Civil Pattern Jury Instructions (I.P.I.) Nos. 30.01; 30.05; 30.04.01; and 30.04.

"Disability" has been defined as the "absence of competent physical, intellectual, or moral powers; incapacity by physical defect or infirmity." *Kresin v. Sears Roebuck*, 316 Ill. App. 3d 433, 442 (1st Dist. 2000).  It can be total or partial, temporary or permanent.  "Loss of a normal life" is the temporary or permanent diminished ability to enjoy life, including a person's inability to pursue the pleasurable aspects of life. I.P.I. (Civil) No. 30.04.02.  Disability and loss of a normal life are not two separate elements of damage but rather, two descriptions of the same element.  "Disfigure" has been defined by the Illinois courts as making one "'less complete, perfect or beautiful in appearance or character.'" *Kresin*, 316 Ill. App. 3d 433, 442.

Damages are also recoverable for a decedent's physical pain and mental suffering suffered while conscious.  In order to recover these damages, a plaintiff must present evidence that the injured party was conscious at some point after an injury. *Clarke v. Medley Moving and*

3

*Storage*, 381 Ill. App. 3d 82, 89 (1st Dist. 2008). In determining whether a decedent suffered

conscious pain and suffering, the fact finder may consider evidence regarding the decedent's

injuries. *Cretton v. Protestant Memorial Medical Center, Inc.*, 371 Ill. App. 3d 841, 847 (5th Dist.

2007). Expert testimony is not required to establish conscious pain and suffering where lay

testimony describing a decedent's actions prior to death is coupled with evidence regarding the

injuries suffered. *Id.*

Under Illinois law, mental suffering caused by or related to a physical injury is

recoverable even in the absence of physical pain. *Holston v. Sisters of the Third Order of St.*

*Francis*, 247 Ill. App. 3d 985, 1001-2 (1st Dist. 1993), *affirmed by Holston v. Sisters of the Third*

*Order of St. Francis*, 165 Ill. 2d. 150 (1995). Mental anguish in a personal injury action covers

the pain associated with the injury, the mental reaction to that pain and the mental reaction to the

possible consequences of the injury: "One could recover for the anxiety accompanying physical

injury, reasonable anxiety about the consequences of the tort, apprehension of future disease,

disability or paralysis, or fear about future surgery." *Id.*

The plaintiff presents the following list of reported cases and verdict reports for conscious

pain and suffering, disability and disfigurement:

A. **Reported Cases**

    1)     *Chambers v. Rush Presbyterian-St. Luke's Medical Center*, 155 Ill. App. 3d. 458 (1st Dist. 1987).

           A 53 year-old lapsed into a coma as a result of high blood sugar. Remained in a coma for four months before he died.

           Appellate court affirmed $800,000 award on the four-month survival action, even without conscious pain.

2) *Medina v. City of Chicago*, 238 Ill. App. 3d. 385 (1st Dist. 1992).

Appellate court reversed trial court's remittitur and reinstated $100,000 pain and suffering award for "a few minutes" of pain and suffering experienced between being shot in the back and unconscious and death.

Assuming "a few" means 3-5 minutes: $20,000 - $33,000 per minute of suffering.

3) *Hall v. Nat'l Freight, Inc.*, 264 Ill. App. 3d. 412 (1st Dist. 1994).

Appellate Court affirmed $750,000 verdict for 26 minutes of conscious pain and suffering while the decedent was pinned in an automobile with injuries likely to produce "intense pain."          ($29,000 per minute)

4) *Holston v. Sisters of the Third Order of St. Francis*, 247 Ill. App. 3d. 985 (1st Dist. 1993), *affirmed* by 165 Ill. 2d. 150 (1995)

29 year-old mother of two suffered cardiac tamponade from a central venous catheter that punctured her heart after gastric bypass surgery for morbid obesity.

Jury awarded $5,000,000 for loss of society to decedent's son and daughter, twelve and eight years old, respectively. The decedent's life expectancy was 50.6 years.

Jury also awarded $600,000 for approximately 43 minutes of conscious pain and suffering before she lapsed into unconsciousness before an unsuccessful open heart surgery. For the same time period, the jury awarded $400,000 for disability and disfigurement for a total of $1,000,000. ($23,255 per minute).

The plaintiff did not clearly prove that the decedent suffered pain as a result of the tamponade and the second surgery, but "...the reasonable inference from the evidence of increasing pressure on her heart, rising pulse rate, and declining blood pressure was that decedent suffered more..." than she ordinarily would have after gastric bypass. *Id.* at 1002.;

5) *Maggos v. Prairie Material Sales, Inc.*, No. 02 L 2005, 2005 WL 1491197, C Cir. Ct. Cook County, IL 2005), cited by *Maldonado v. Sinai Medical Group*, 706 F. Supp. 2d. 882 (N. D. Ill. 2010).

34 year-old woman temporarily paralyzed and forced to undergo spinal fusion after auto collision. Plaintiff regained full strength and sensory perception but was unable to ski.

Jury awarded $4,630,000 in pain and suffering damages, even though she made a near-complete recovery.

6) *Cretton v. Protestant Memorial Medical Center*, 371 Ill. App. 3d. 841 (5th Dist. 2007).

Decedent admitted to hospital in advanced stages of chronic obstructive pulmonary disease. She fell or was allowed to fall and died one day later from a head injury.

Appellate Court affirmed verdict of $950,000 for one day of conscious pain and suffering evidenced by anxiety, gasping for air and difficulty communicating.

7) *Innocent Kasongao v. Untied States*, 523 F. Supp. 2d. 759 (N. D. Ill. 2007).

Death of a 39 year-old mother and wife.

Failure to timely diagnose lactic acidosis caused by a drug given to treat HIV infection.

Developed symptoms in August, 2001, but defendant did not diagnose it until October 22, 2001. She died on October 24, 2001.

Survived by her husband and three children, aged five, seven and ten.

Court awarded each child $1,000,000 and the husband $500,000 for loss of society.

Court also awarded $1,000,000 for 22-24 days of abdominal pain, vomiting, shortness of breath, ankle and feet pain, weakness and dizziness. ($41,666 per day in pain and suffering)

8) *Clarke v. Medley*, 381 Ill. App. 3d. 82 (1st Dist. 2008).

83 year-old decedent struck by a truck.

Appellate Court affirmed $275,000 pain and suffering verdict for 10-15 minutes of conscious suffering. ($18,333 per minute).

Also affirmed $1,200,000 lost society award for four adult children.

9) *Hardnick v. United States*, 2009 U.S. Dist. LEXIS 53739 (N. D. Ill. 2009).

Death of 13 year-old girl from untimely diagnosed sinusitis, abscess and meningitis.

Court awarded $250,000 of conscious pain and suffering (amount the plaintiff requested) for 3-5 days of severe headache, facial swelling, ptosis and an extra sinus surgery. ($50,000 - $83,333 in pain and suffering per day)

10)   *Travaglini v. Ingalls Health System*, 396 Ill. App. 3d. 387 (1st Dist. 2009)

84 year-old left unattended at defendant hospital chocked on a sandwich and died.

$500,000 for a "matter of minutes" of pain and suffering.

11)   *Colella v. JMS Trucking Co.*, 403 Ill. App. 3d. 82 (1st Dist. 2010).

Death of a 61 year-old man hit by a dump truck, causing multiple lower extremity and abdominal injuries. Decedent bled to death within 3-4 minutes but was conscious for some of that time.

$1,000,000 jury verdict for conscious pain and suffering affirmed. ($250,000 per minute).

$8,000,000 loss of society award for wife and three adult children affirmed.

## B.   Verdict Reports

1)   *Estate of Dorota Spyrka v. Cook County*, No. 01 L 1258; Tried August, 2004

41 year-old woman died from pulmonary embolism.
$2,200,000 for 1 day of pain and suffering.

2)   *Estate of Khadija Amer v. Swedish Covenent Hosp.*, No. 01 L 7273; Tried November, 2004

25 year-old woman died from undiagnosed cardiomyopathy. $250,000 for 24 hours of pain and suffering.

3)   *Estate of Irene Stevenson v. Planned Parenthood*, No. 02 L 15845; Tried June, 2006

23 year-old woman died after an abortion procedure. $250,000 for six days of pain and suffering.

4) *Estate of Charles Ingelia v. Target Electric, Inc.*, No. 06 L 1720; Tried January, 2011

57 year-old male electrician died from electrical burns. $1,700,000 for three days of pain and suffering.

5) *Fernandez v. Salti*, 08 L 1117, Tried February, 2012

49 year-old man died from sepsis from a punctured duodenum (part of the small bowel) during a splenectomy. He survived a month and underwent two exploratory laparotomies.

$500,000 for pain and suffering and $1,500,000 for loss of normal life.

6) *Harris v. United Road Towing, Inc.*, 09 L 8841, Tried June, 2013

40 year-old man died after a motor vehicle collision. $1,000,000 for 4.5 hours of pain and suffering.

7) *Yates v. Dolittle*, 09 L 36, Tried November, 2013

47 year-old woman died from an undiagnosed bowel obstruction three days after gastric bypass surgery. $110,000 pain and suffering.

8) *Tagalos v. Sisters of St. Francis Health Services, Inc.*, 08 L 5238, Tried November 2013

49 year-old woman died from an improperly treated asthma attack. $200,000 for 11 minutes of pain and suffering.

9) *Lopez v. University of Chicago Hospital*, 09 L 12356, Tried November, 2013

33 year-old woman died after C-section and failure to diagnose placenta accreta which can cause significant bleeding. The baby was successfully delivered, but the decedent suffered massive blood loss, DIC, shock, acute renal failure and ischemia in the arms and legs with gangrene.

$1,000,000 pain and suffering, $1,800,000 for loss of normal life and $750,000 disfigurement for 7 days.

10) *Bruce v. CAV, International, Inc.*, 10 L 13818, Tried February 2014

64 year-old man fell onto concrete tarmac while working for United Airlines in Kuwait, causing brain injury and paralysis. He died six days later.

$302,500 for disability and $144,325 for disfigurement for 6-7 days of unconsciousness before death.

11) *Wacholz v. Elmhurst Memorial Hospital*, 10 L 1649, Tried June, 2014

51 year-old man died from bleeding after a carotid endarterectomy. $850,000 for 9 hours of pain and suffering and $400,000 for emotional distress.

Regina Romero's post-conization hospital course is literally a litany of horrors. She went to Westside Medical Center on July 18, 2001 for a routine cervical biopsy and never left. In the next 49 days, she suffered countless painful complications, procedures and indignities. For all but three of those days, she was conscious, in pain and aware of her plight.

As a result of the VA's negligence on and after July 18, 2001, Regina was forced to undergo fourteen separate abdominal surgeries from July 18 - September 4, 2001. As her condition deteriorated, she lay in bed on a ventilator - first with an endotracheal tube, then with a tracheostomy. Her abdominal wound remained open and her abdominal cavity was infected, draining green, brown and red discharge from numerous tubes and drains inserted into her bowels, gallbladder, stomach, etc.

Mrs. Romero's open abdominal wound required dressing changes three times a day. These changes were so painful, she had to be given morphine before them. Her entire body swelled up. At one point, she was so swollen that fluid "oozed" from her fingers and toes.

She suffered numerous significant complications, including disseminated intravascular coagulopathy (DIC) which caused "projectile" bleeding and oozing of blood from every orifice and toxic epidermal necrolysis (TEN), a particularly nasty complication caused by a reaction to

one of the antibiotics. She developed a painful rash over most of her body and mucus membranes, her skin turned black, died and literally sloughed off, leaving large open wounds. These are just a small sample of Regina's many travails.

The Seventh Circuit has suggested the use of "ratios" as one factor in the analysis of noneconomic damages awards. In *Ford-Shelebo v. United States*, 980 F. Supp. ed. 917 (N.D. Ill. 243), the court noted that, of the comparable verdicts presented to the court in that case, minor wrongful death beneficiaries had been awarded $40,000 - $90,000 per year of the decedent's life expectancy. The cases and verdict reports cited herein indicate that decedents with suffering comparable to Mrs. Romero's have been awarded tens or hundreds of thousands of dollars *per minute*. Verdicts for longer periods of pain, suffering, disability and disfigurement before death have ranged from $40,000 per day to over $500,000 per day (*Lopez v. University of Chicago Hospital, No. 09 L 12356;* and *Ingelia v Target Electric*, No. 06 L 1720), leading to a range in this case of $1,884,000 to over $23,000,000.

The cases most similar to the present case include *Fernandez, Lopez* and *Ingelia*. The *Ingelia* case involved a $1,700,000 verdict for a 57 year-old electrician who suffered with extensive burns for three days before dying. In the present case, Regina Romero sustained burn-like injuries both internally and externally. Portions of her bowel were "burned" by Monsel's solution leading to a cascade of painful and ultimately deadly complications. One of those complications was TEN which caused the top layers of her skin and mucous membranes to blacken, die and slough off, leaving extensive open wounds. Certainly Mrs. Romero suffered at least as much, if not more, than Mr. Ingelia.

In *Fernandez v. Salti*, No. 08 L 1117, the decedent suffered a punctured duodenum during

10

spleen surgery. That puncture led to complications similar to those Mrs. Romero suffered and required the *Fernandez* decedent to undergo two additional laparotomies before he died one month after the initial surgery. The verdict was $2,000,000 for pain and suffering and loss of a normal life. In the present case, Mrs. Romero suffered 50% longer than the *Fernandez* decedent and was forced to undergo 14 additional laparotomies , debridements and washouts, not to mention TEN, DIC, sepsis, and other things.

Finally, and perhaps most similarly, is *Lopez v. University of Chicago*, 90 L 12356. In that case, the decedent suffered extensive blood loss, shock, DIC, organ failure and gangrene. She lived for seven days and was awarded $3,550,000 for pain and suffering, loss of a normal life and disfigurement. The effects of Mrs. Romero's TEN were very much like gangrene and Mrs. Romero suffered for 46 days with an infected abdomen and a systemic infection, and she also suffered from DIC.

For 46 days of pain and suffering and 49 days of loss of a normal life and disfigurement, the plaintiff respectfully submits that $3,000,000 is a fair and reasonable sum. It is commensurate with the award in *Fernandez*, though the decedent in *Fernandez* certainly suffered fewer complication and surgeries than Mrs. Romero. It is also less, relatively, than the amount awarded in *Lopez* for only seven days of pain and suffering, loss of a normal life and disfigurement.

**B.  Wrongful Death**

The purpose of the Illinois Wrongful Death Act is to compensate the next of kin for the pecuniary losses resulting from the wrongful death of a loved one. *Elliott v. Willis,* 92 Ill. 2d. 530, 540 (1982); *Hardnick v. United States*, 2009 U.S. LEXIS 53739 (N.D. Ill. 2009).

"Pecuniary" losses includes "loss of society." *Id.* Society has been defined as encompassing "a broad range of mutual benefits each family member receives from the others' continued existence, including love, affection, care, attention, companionship, comfort, and protection." *Hart v. Chettri,* 158 Ill. App. 3d. 26 (5th Dist. 1990); *Ford-Sholebo v. United States,* 980 F. Supp, 2d. 917, 1001 (N.D. Ill. 2013). With the death of a parent, the fact-finder can take into account the loss of instruction and moral, physical and intellectual training caused by the death of the parent. *Ford-Sholebo,* 98 F. Supp. 2d. 917, 1001.

Under Illinois law, the plaintiff is entitled to a presumption that the death of a parent has caused not only a loss, but a *substantial* loss of society to a surviving child. *Ballweg v. City of Springfield,* 114 Ill. 2d. 107, 120 (1986). While this rebuttable presumption does not necessarily guarantee substantial recovery, it shifts the burden of coming forward with proof that the damages are minimal or nonexistent onto the party who caused the death. *Ford-Sholebo v. United States,* 980 F. Supp. 2d. 917, 1000 (N.D. Ill. 2013). Thus, in the present case, there is a presumption that Gilbert and Christina have suffered *substantial* pecuniary losses as a result of their mother's death.

The plaintiff presents the following comparable wrongful death verdicts:

## A.    Reported Cases

1)    *Holston v. Sisters of the Third Order of St. Francis,* 247 Ill. App. 3d. 985 (1st Dist. 1993), *affirmed* by 165 Ill. 2d. 150 (1995)

29 year-old mother of two suffered cardiac tamponade from a central venous catheter that punctured her heart after gastric bypass surgery for morbid obesity.

Jury awarded $5,000,000 for loss of society to decedent's son and daughter, twelve and eight years old, respectively. The decedent's life expectancy was 50.6 years.

12

2)   *Innocent Kasongao v. United States*, 523 F. Supp. 2d. 759 (N. D. Ill. 2007).

Death of a 39 year-old mother and wife from a Failure to timely diagnose lactic acidosis caused by a drug given to treat HIV infection.

Survived by her husband and three children, aged five, seven and ten. Court awarded each child $1,000,000 and the husband $500,000 for loss of society.

3)   *Cason v. Holmes Transport*, 2009 U.S. Dist. LEXIS 114288 (S. D. Ill. 2009).

55 year-old died in a motor vehicle collision, survived by his wife and two sons. Court awarded $750,000 to each adult son (and $4,000,000 to the widow).

4)   *Arpin v. United States*, 2009 U.S. Dist. LEXIS 105935 (N. D. Ill. 2009) (Arpin II)

Death of husband and father of four adult children (39, 37, 33 and 31 years old). Court awarded $750,000 to each adult child (and $4,000,000 to widow).

5)   *Colella v. TMS Trucking Co.*, 403 Ill. App. 3d. 82 (1ˢᵗ Dist. 2010).

Death of a 61 year-old man hit by a dump truck, causing multiple lower extremity and abdominal injuries. $8,000,000 loss of society award for wife and three adult children affirmed.

6)   *Ford-Sholebo v. United States*, 980 F. Supp. 2d. 917 (N. D. Ill. 2013)

Death of a 30 year-old detainee at the Metropolitan Correctional Center caused by failure to treat seizure disorder.

Notes that juries have awarded between $10,000 and $90,000 for loss of society to minor children. Court awarded $1,575,000 in loss of society damages to decedent's minor child.

## B.   Verdict Reports

1)   *Estate of Frazier v. Nash*, No. 99 L 14464; Tried November 2003

47 year-old woman died from pulmonary embolism after surgery. $2,500,000 lost society for twin adult children (26 years old).

2)   *Estate of Dorota Spyrka v. Cook County*, No. 01 L 1258; Tried August, 2004

41 year-old woman died from pulmonary embolism.
$7,689,655 lost society verdict to 12 year-old daughter.

3) *Estate of Khadija Amer v. Swedish Covenent Hosp.*, No. 01 L 7273; Tried November, 2004

25 year-old woman died from undiagnosed cardiomyopathy. $1,250,000 loss of society to each of decedent's two children (a newborn and an older minor, though no age given).

4) *Estate of Irene Stevenson v. Planned Parenthood*, No. 02 L 15845; Tried June, 2006

23 year-old woman died after an abortion procedure. $1,750,000 lost society to each of two minor children (no ages given).

5) *Estate of Tajuana Baker v. Sisters of St. Francis*, No. 03 L 1370; Tried February, 2007

48 year-old woman died from undiagnosed pulmonary embolism.

$3,000,000 lost society to husband and two adult children (no ages given). Defendants contested causation.

6) *Estate of Nellie Hood v. Magleo*, No. 05 L 5414; Tried November, 2008

61 year-old woman died from a failed intubation before a knee surgery. $7,500,000 lost society to two adult sons ($3,500,000 each).

7) *Estate of Kathleen Duffy v. Little Co. of Mary Hosp.*, No. 06 L 1671; Tried October, 2009

45 year-old woman died in defendant's emergency room after being brought in with very high blood sugar level. $4,000,000 lost society to husband and two (presumably) adult children.

8) *Estate of Phyllis Farissier v. Northwestern Oncology*, No. 05 L 11491 (Refiled as 09 L 1720); Tried January, 2011

53 year-old woman died from preventable chemotherapy complication. $4,742,000 lost society to husband and two adult children.

9) *Estate of Charles Ingelia v. Target Electric, Inc.*, No. 06 L 1720; Tried January,

14

2011

57 year-old male electrician died from electrical burns. $3,810,000 lost society to wife and four adult children.

10) *Hamilton v. Excel Emergency Care*, 07 L 6654, Tried May, 2011.

35 year-old man died from undiagnosed aortic dissection. $2,504,528 in loss of society to one minor child.

11) *Fernandez v. Salti*, 08 L 1117, Tried February, 2012

49 year-old man died from sepsis from a punctured duodenum (part of the small bowel) during a splenectomy. $4,500,000 in loss of society to wife and eleven year-old son.

12) *Harris v. United Road Towing, Inc.*, 09 L 8841, Tried June, 2013

40 year-old man died after a motor vehicle collision. $4,500,000 for loss of society to wife and two children (no ages given).

13) *Yates v. Dolittle*, 09 L 36, Tried November, 2017

47 year-old woman died from an undiagnosed bowel obstruction one day after gastric bypass surgery. $2,320,182 loss of society to husband and adult son.

14) *Tagalos v. Sisters of St. Francis Health Services, Inc.*, 08 L 5238, Tried November 2013

49 year-old woman died from an improperly treated asthma attack. $4,500,000 loss of society to husband and one adult son.

15) *Lopez v. University of Chicago Hospital*, 09 L 12356, Tried November, 2013

33 year-old woman died after C-section and failure to diagnose placenta accreta which can cause significant bleeding.

$12,000,000 in loss of society to husband and two children, one the newborn that survived the C-section.

16) *Bruce v. CAV, International, Inc.*, 10 L 13818, Tried February 2014

64 year-old man fell onto concrete tarmac while working for United Airlines in

Kuwait, causing brain injury and paralysis. He died six days later.

$6,600,000 loss of society to wife and two adult sons.

17) *Wacholz v. Elmhurst Memorial Hospital*, 10 L 1649, Tried June, 2014

51 year-old man died from bleeding after a carotid endarterectomy.

$2,750,000 for loss of society to wife and three adult daughters. There was evidence of a reduced life expectancy.

At the time of her death, Regina Romero was 46 years old. According to Life Expectancy Tables in Evidence, Ms. Romero had a life expectancy of 36.7 years. Thus, Gilbert Romero and Christina Czmil have suffered the loss of their mother for 36.7 years.

Mrs. Romero's daughter, Christina, had just turned thirteen years-old when Regina died. Christina lived with her mother in Berwyn. Christina's father, Scott Czmil, lived in Addison, Illinois with Christina's stepmother. Christina visited her father every other weekend.

Gilbert Romero was 25 years old when his mother died. His father, Gilbert Romero, Sr., was a veteran who married Regina in 1974. He died two weeks before Gilbert was born.

For wrongful death verdicts involving an identifiable minor child of the decedent, the range has been $1,000,000 to $7,689,000. The average verdict for the minor was $2,724,280. Of the cases in which the age of the decedent and the age of the minor is reported, the average verdict was $2,937,800. The most factually analogous verdicts are *Kasongao* ($1,000,000), *Fernandez*, ($2,250,000 presumably), *Holston* ($2,500,000) and *Spyrka* ($7,689,000). *Kasangao* involved a 39 year-old deceased mother and a 12 year-old child. *Fernandez* involved a 49 year-old deceased father and an 11 year-old son. In *Holston*, the deceased mother was 29 years-old, leaving a 12 year old child and in Spyrka the decedent was a 41 year-old mother of a 12 year-old

16

daughter.

In *Ford-Shelebo v. United States*, 980F. Supp. 2d. 917 (N.D. Ill. 2013), the court noted that in the comparable verdicts it reviewed, the minor child received from $40,000-$90,000 for each year of the decedent's life expectancy where it was known. That range would translate to a $1,468,000 - $3,303,000 for the loss of Christina Czmil's mother. Christina had just turned 13 years-old, an age when a daughter arguably needs her mother the most. For 36.7 years of Christina Czmil's loss of society, the plaintiff respectfully suggests that $2,500,000 is fair, reasonable and supported by the evidence and comparable verdicts.

Verdicts involving adult children of decedents have ranged from $750,000 to $3,500,000 for an average of $1,636,615. These verdicts can be difficult to compare because the loss of society amounts are often reported as one lump sum for all beneficiaries. In this situation, the plaintiff has assumed that each beneficiary shared equally.

The verdicts that have identified the age of the decedent, the age of the adult child and the specific amount awarded to that child include *Frazier* and *Hood*. *Frazier* involved the death of a 47 year-old woman who left behind twin 26 year-old children. Each twin received $2,500,000. *Hood* involved the death of a 61 year-old woman. Each of her adult sons received $3,500,000. In *Arpin v. United States*, 2009 U.S. Dist. LEXIS 105935 (S.D. Ill. 2005), the court awarded $750,000 to each of four children ranging in age from 31 - 39 years old. The age of the deceased father is not stated but he had been married for 35 years, had served in the Korean War and was presumably considerably older than Regina Romero's 46 years.

Gilbert Romero, Jr. was 25 years old when his mother died. For 36.7 years of Gilbert Romero's loss, the plaintiff respectfully suggests that the sum of $1,750,000 is fair, reasonable

17

and supported by the evidence.

Based upon the foregoing, the plaintiff requests the following verdict which is supported

by the evidence and comparable verdicts:

| | |
|---|---|
| Survival Action (Pain and suffering, loss of a normal life and disfigurement) | $3,000,000 |
| Wrongful Death Christina Czmil | $2,500,000 |
| Gilbert Romero, Jr. | $1,750,000 |

Respectfully submitted,

Kenneth T. Lumb

Kenneth T. Lumb
Corboy & Demetrio, P.C.
Attorney for Plaintiff
33 North Dearborn Street, 21st Floor
Chicago, Illinois 60602
(312) 346-3191
Firm I.D. No. 108

18



ᴬᴄᴄᴇꜱꜱPʟᴜꜱ®

**Cook County & Illinois**

# JURY VERDICT REPORTER

**Publication: Cook County Jury Verdict Reporter Published: 10/15/2004**

(WW 2/1)    MEDICAL MALPR.–FATAL PULMONARY EMBOLISM AFTER HEPARIN
STOPPED (12H)

*Estate of Dorota Spyrka, deceased v Cook County Hospital, Dr. Chi Du* 01L-1258 Tried Aug. 26-Sep. 9, 2004

| | |
|---|---|
| Verdict: | $16,957,310 v both defts ($689,655 past loss of society to husband; $5,000,000 future loss of society to husband; $689,655 past loss of society to daughter; $7,000,000 future loss of society to daughter; $44,000 past loss of benefits and services to husband; $350,000 future loss of benefits and services to husband; $44,000 past loss of benefits and services to daughter; $440,000 future loss of benefits and services to daughter; $500,000 LT; $2,200,000 survival pain & suffering) |
| Judge: | James Michael Varga (IL Cook-Law) |
| Pltf Atty(s): | James T. Ball, Theodore C. Jennings and Erin M. Kinahan of Ball & Jennings DEMAND: $27,000,000  ASKED: $28,775,327 |
| Deft Atty(s): | Virginia L. Cooper and Joan E. Powell of Cook County State's Attorney for both defts (SELF-INSURED) OFFER: CCH $1,500,000 |
| Pltf Expert(s): | Dr. Gordon F.F. Fall, 7715 24th Ave. NW, Seattle, WA (206-782-1133) (Family Practice), Dr. William D. Haire of University of Nebraska Medical Center, Dept. of Internal Medicine, Emile @ 42nd St., Omaha, NE (402-559-5326) (Hematologist), Dr. David M. Systrom of Massachusetts General Hospital, Pulmonary Dept., 55 Fruit St., Boston, MA (617-726-3734) (Pulmonologist), Dr. Robert J. Toltzis of Cincinnati Heart Group, 625 Eden Park Dr., Cincinnati, OH (513-651-0222) (Cardiologist) and Dr. Arthur C. Waltman of Massachusetts General Hospital, Radiology Dept., 55 Fruit St., GRB-2, Boston, MA (617-726-8314) (Radiologist) |
| Deft Expert(s): | Dr. Eric Gluck, 2272 Kaskaskia Ct., Naperville, IL (312-935-5556) (Pulmonologist) and Dr. Robert Vogelzang (Radiologist) for both defts |

Dorota Spyrka was admitted to Cook County Hospital with pneumonia on June 1, 2000. She developed a pulmonary embolism on June 6 and was transferred to the intensive care unit, where she was stabilized with tPA and Heparin (a drug that prevents clotting). On June 7, Dr. Chi Du, an employee of the hospital, discontinued patient's Heparin in anticipation of a pulmonary angiogram that had been ordered. Patient F-41 suffered another pulmonary embolism and died the following day; she was survived by her husband and a 12-year-old daughter ($427,000 PCV LT to age 65 as a medical technician). Estate contended that Dr. Du was negligent in discontinuing the Heparin after less than two days, as opposed to the typical regimen of five days. Estate further asserted that not only was the angiogram unnecessary, but it was never scheduled and never performed. Dr. Du claimed that a hospital fellow instructed her to discontinue the Heparin, which was denied by the ICU team and the fellow (who was also employed by hospital). Defense denied that stopping Heparin was the proximate cause of patient's death; the pathologist who performed the autopsy testified that the cause of death was the initial pulmonary embolism that preceded cessation of Heparin and there was no new clot sufficient to have caused her death. Jury deliberated 3 hours and 10 minutes. NOTE: For a summary of subsequent appellate action regarding this case, see the Jury Verdict Reporter's Appellate Review of Damages at 8 ARD 17.

(c) 2010 Law Bulletin Publishing Company

22-Oct-2010 12:18



**Cook County & Illinois**

# JURY VERDICT REPORTER

**Publication:** Cook County Jury Verdict Reporter Published: 2/18/2005

(WW 19/1)    MEDICAL MALP.–YOUNG WOMAN DIES FROM UNDETECTED HEART
CONDITION (12H)

*Estate of Khadija Amer, deceased v Swedish Covenant Hospital, Dr. James Vasilakis* 01L-7273 (refiled from
95L-2938) Tried Nov. 3-18, 2004

| | |
|---|---|
| Verdict: | $3,000,000 v both defts ($2,750,000 loss of society: $1,250,000 to son, $1,250,000 to daughter, $250,000 to husband; $250,000 survival pain & suffering) |
| Judge: | Randye A. Kogan (IL Cook-Law) |
| Pltf Atty(s): | Philip F. Maher, Stephen E. McLean and Janice L. Schaffrick of Philip F. Maher & Associates DEMAND: $1,100,000 |
| Deft Atty(s): | Patricia J. Foltz and R. Fletcher Koch of Anderson, Bennett & Partners for both defts (CHRPP) OFFER: $150,000 total |
| Pltf Expert(s): | Dr. David Zull (Emergency Medicine), Dr. Jesse Hall (Critical Care) and Dr. Stephen T. Hubbard of University of Washington, 4490 Eagle Harbor Dr. NE, Bainbridge Island, WA (206-855-8132) (Cardiologist) |
| Deft Expert(s): | Dr. Daniel J. Sullivan (Emergency Medicine) and Dr. Marc L. Tenzer, 7447 W. Talcott Ave. #200, Chicago, IL (773-774-5020) (Cardiologist) for both defts |

Feb. 9, 1994, Khadija Amer presented to Swedish Covenant Hospital's emergency room at 8:20 p.m. with
complaints of productive cough, pain on inspiration, and chills. Khadija F-25 was born in Kuwait and spoke
only Arabic, so her husband Isam Amer, born in Jordan, provided translation. A chest x-ray was read by deft
E/R physician Vasilakis as showing pneumonitis, and patient was diagnosed with bilateral pneumonia. Dr.
Vasilakis had her admitted into the hospital on a general care floor and ordered an IV saline solution. Around
7:15 a.m. the next morning, Feb. 10, Khadija suffered cardiopulmonary arrest and died (survived by husband,
who remarried 2.5 years later, and two children). Due to religious reasons, no autopsy was performed, and the
death certificate listed pneumonia as the cause of death. Estate contended patient died of undiagnosed
postpartum cardiomyopathy; she had given birth to her second child two months prior to admission, a fact
which was not recorded in E/R history. Pltf's experts testified that 1) the chest x-ray showed an enlarged heart,
which was not noted by Dr. Vasilakis but which in combination with her being two months postpartum should
have led to the consideration of postpartum cardiomyopathy, 2) patient should have been admitted to ICU or
telemetry unit where she would have received continuous cardiac monitoring which would have detected
arrhythmia in time to allow life saving response, and 3) the IV saline solution ordered by Dr. Vasilakis
aggravated patient's pulmonary edema. Defense argued that the chest x-ray showed heart was only borderline
enlarged if at all, any appearance of enlargement was due to magnification inherent in an AP view, diagnosis of
bilateral pneumonia with admission to general care floor and order for IV saline solution was totally
appropriate, postpartum cardiomyopathy occurs in only 1 in 10,000 pregnancies, and patient's sudden death was
a result of viral myocarditis or pulmonary embolism. Parties had entered into a high/low agreement of
$450,000-$4,500,000 during jury deliberations, and the judgment on the verdict has been paid.

(c) 2010 Law Bulletin Publishing Company

22-Oct-2010 12:18



**ACCESSPLUS**

Cook County & Illinois

# JURY VERDICT REPORTER

**Publication: Cook County Jury Verdict Reporter Published: 9/29/2006**

(XX 50/1)    <u>MEDICAL MALPRACTICE--YOUNG WOMAN DIES SIX DAYS AFTER</u>
<u>ABORTION (12L)</u>

*Estate of Irene Stevenson, deceased v Planned Parenthood, Dr. Gregg Lloyd* 02L-15845 Tried Jun. 27-Jul. 10,
2006

| | |
|---|---|
| Verdict: | $4,000,000 v Planned Parenthood ($3,750,000 wrongful death; $250,000 survival pain & suffering); Dr. Gregg Lloyd dismissed after settling out for an undisclosed amount on second day of trial. |
| Judge: | Richard J. Elrod (IL Cook-Law) |
| Pltf Atty(s): | James M. Sanford and Beverly P. Spearman of Cochran, Cherry, Givens, Smith & Montgomery DEMAND: $2,000,000 policies ASKED: $11,000,000 |
| Deft Atty(s): | Brian T. Henry and Christine J. Iversen of Pretzel & Stouffer for Planned Parenthood (National Union Fire Ins.) OFFER: PP $100,000; J. Kent Mathewson and Kathleen A. O'Connor of Donohue, Brown, Mathewson & Smyth for Lloyd (American Physicians Assurance) |
| Pltf Medl: | Dr. Vybert Greene (Ob/Gyn) |
| Pltf Expert(s): | Dr. Arnold Lentnek, 350 E. 79th St., #11B, New York, NY (404-798-7152) (Infectious Disease), Dr. John DiOrio, Jr., 1725 Broad St., Cranston, RI (401-467-6270) (Ob/Gyn) and Dr. Richard M. Sobel, 101 Passage Point, Peachtree City, GA (800-381-2795) (Emergency Medicine) |
| Deft Expert(s): | Dr. Evan Keith Saunders, 2901 W. Kinnickinnic River Pkwy., #417, Milwaukee, WI (414-649-3313) (Ob/Gyn) and Dr. Chris Costas (Infectious Disease) for Planned Parenthood |

July 6, 2002, Irene Stevenson (age 23) underwent an elective abortion of a seventeen week pregnancy at
Planned Parenthood. She died six days later on July 12, 2002, due to sepsis resulting from retained products of
conception (survived by husband and two minor children; jury allocated wrongful death portion of award
$250,000 to husband, $1,750,000 to each child). Estate contended non-medical personnel at Planned Parenthood
mishandled post-procedure emergency telephone calls and failed to advise patient to seek immediate medical
attention for pain, fever and chills. Stevenson went to the emergency room at Michael Reese Hospital on July 9,
where E/R physician Gregg Lloyd allegedly misdiagnosed her condition as hepatitis, failed to prescribe
antibiotics, and failed to timely diagnose and treat septic abortion, sepsis and disseminated intravascular
coagulation. Defense for Planned Parenthood maintained phone calls were handled appropriately.

---

(c) 2010 Law Bulletin Publishing Company

22-Oct-2010 12:18



**AccessPlus⁴**

Cook County & Illinois

# Jury Verdict Reporter

**Publication: Cook County Jury Verdict Reporter Published: 4/15/2011**

(CCC 27/1)    <u>WORK INJURY--ELECTRICIAN FATALLY ELECTROCUTED AT CTA RAIL
SUBSTATION (6)</u>

*Estate of Charles Ingolia, deceased v Target Electric Inc.* 06L-13106 Tried Jan. 13-Feb. 4, 2011

| | |
|---|---|
| Verdict: | $4,101,500 after 35% off $6,310,000 ($1,700,000 survival pain & suffering; $50,000 medical expenses; $750,000 loss of money, goods and services; $3,810,000 loss of society and consortium). However, parties had entered into a $1,200,000 - $3,500,000 high/low agreement, so the estate will receive $3,500,000 plus waiver of the $300,000 workers' comp lien. |
| Judge: | Elizabeth M. Budzinski (IL Cook-Law) |
| Pltf Atty(s): | Larry E. Weisman and Joseph P. Sorce of Goldberg, Weisman & Cairo DEMAND: $3,000,000 ASKED: $8,000,000 - $10,000,000 |
| Deft Atty(s): | Daniel Cummings and Robin K. Powers of Rothschild, Barry & Myers (Chartis; ACE) OFFER: $1,200,000 - $3,500,000 high/low |
| Pltf Medl: | Dr. Richard L. Gamelli (Burns) and Dr. Rebecca Pifer (Emergency Medicine) |
| Pltf Expert(s): | Kevin Lynch of IBEW/NECA Technical Institute, 6201 W. 115th St., Alsip, IL (708-389-1340) (Electrical Safety) and Benjamin D. Miller, P.E. of B. Miller Engineering, P.O. Box 483, Deerfield, IL (847-948-7746) (Electrical Engineer) |
| Deft Expert(s): | <u>Tage Carlson</u>, Ph.D. (Safety) and <u>Andrew J. Neuhalfen</u>, Ph.D. (Electrical Engineer) |

Nov. 13, 2006, electrician Charles Ingolia was instructed to clean a switchgear cabinet at the CTA Substation located at 3360 N. Clark St., in preparation for energizing a rectifier system that would power CTA Brown Line trains. In the process of cleaning the electrical equipment and believing it was de-energized, he raised a protective shield, exposing himself to 12,600 volts of electricity and causing an explosion. Ingolia M-57 suffered burns over 35% of his body and died three days later, survived by his wife and four adult children ($50,000 medl., $550,000 LT 5 years). The estate contended deft was at fault for sending Ingolia into the cabinet without informing him that a portion of the electrical equipment was energized and with confusing instructions. The defense asserted Ingolia was an experienced electrician having worked in the trade for 38 years, a journeyman electrician should assume equipment is live, he did not verify the presence of energy, he ignored a warning sign on the protective shield, and he lifted the shield thereby exposing himself to the live equipment and causing the explosion. Ingolia exclaimed "I screwed up" immediately following the occurrence.

(c) 2014 Law Bulletin Publishing Company

19-Aug-2014 10:53



**AccessPlus⁵**

**Cook County & Illinois**
# JURY VERDICT REPORTER

**Publication:** Cook County Jury Verdict Reporter **Published:** 4/13/2012

**(DDD 26/1)**   MEDICAL MALPRACTICE--DEATH AFTER BOWEL WAS PUNCTURED DURING SURGERY (12O)

*Estate of Juan Fernandez, deceased v Dr. George Salti, Dr. Carlos Galvani, Dr. Raquel Bueno, Dr. Stanley Harper* 08L-1117 Tried Feb. 1-17, 2012

| | |
|---|---|
| **Verdict:** | $7,522,032 v all defts ($1,022,033 past medical expenses; $500,000 pain & suffering; $1,500,000 loss of normal life; $4,500,000 loss of society). However, parties entered into a high/low agreement of $250,000 - $6,000,000 during jury deliberations. |
| **Judge:** | James P. Flannery, Jr. (IL Cook-Law) |
| **Pltf Atty(s):** | Edward W. McNabola and Theodore C. Jennings of Cogan & McNabola DEMAND: $2,950,000  ASKED: $13,022,033 |
| **Deft Atty(s):** | David C. Hall of Hall, Prangle & Schoonveld for all defts (University of Illinois; SELF-INSURED) OFFER: $250,000 - $6,000,000 high/low |
| **Pltf Expert(s):** | Dr. David Easter of University of California - San Diego, 200 Dickinson Street, San Diego, CA (619-543-2521) (General Surgeon), Dr. Ira M. Hanan (Gastroenterologist) and Dr. Richard J. Quigg (Nephrologist) |
| **Deft Expert(s):** | Dr. Michael Goldberg (Gastroenterologist) and Dr. Dmitry Oleynikov of University of Nebraska Medical Center, 983280 Nebraska Medical Center, Omaha, NE (402-559-4017) (General Surgeon) for all defts |

On January 5, 2007, Juan Fernandez underwent a splenectomy (spleen removal) at University of Illinois Medical Center in Chicago to correct his ITP (idiopathic thrombocytopenic purpura), a blood disorder he had previously been managing with steroids. Defendant Dr. Salti was the attending surgeon, and he opted to perform the splenectomy surgery using a DaVinci Robotic Surgical System. Defendant Galvani was the co-surgeon, while surgical fellow Bueno and surgical resident Harper were the assistant surgeons for this procedure. During the surgery, there was an incidental finding of severe liver cirrhosis. After the surgery, M-49 Fernandez began exhibiting signs and symptoms of infection. Plaintiff contended the defendants punctured the duodenum during the surgical procedure. On January 11, Dr. Salti performed an exploratory laparotomy and discovered 1.5 liters of purulence (pus) inside the patient's abdomen, but failed to detect the puncture. Dr. Salti testified that he ran the entire bowel during the exploratory surgery and there was no evidence of a perforation. Plaintiff asserted Dr. Salti failed to completely evaluate the duodenum where the perforations were located. Another exploratory surgery was performed on January 19 by Dr. Galvani, who located and repaired the perforations. However, Fernandez suffered sepsis and multi-system organ failure due to the duodenal perforations, and he died at UIC on February 8, 2007. He was survived by his wife and an 11-year-old son ($1,022,033 medical expenses). The estate sued under a *res ipsa loquitur* count related to the initial splenectomy surgery and a negligence count related to subsequent care and treatment after the splenectomy. The defense contended the perforations occurred spontaneously after the January 11 surgery as a result of the patient's cirrhosis, leading to infection and ischemia that was worsened because Fernandez was in an immuno-compromised state due to steroid use and acute renal failure. As a condition of the high/low agreement reached while the jury was deliberating, defendants Galvani, Bueno and Harper were dismissed without prejudice.

(c) 2014 Law Bulletin Publishing Company

19-Aug-2014 10:53



**ACCESSPLUS®**

Cook County & Illinois
# JURY VERDICT REPORTER

Publication: Cook County Jury Verdict Reporter Published: 3/15/2013

(EEE 22/1) <u>TRAFFIC--CARPOOL VAN PASSENGER KILLED IN REAR-END CRASH ON THE DAN RYAN (IL)</u>

*Estate of George F. Harris, Jr., deceased v United Road Towing Inc., E & R Towing & Garage Inc., Nicolas Nieves* 09L-8841 Tried Jan. 15-25, 2013

| | |
|---|---|
| Verdict: | $7,365,000 v all defts ($1,250,000 past and future loss of economic support; $165,000 past and future loss of household services; $450,000 grief and sorrow of next of kin; $4,500,000 past and future loss of society; $1,000,000 survival/conscious pain & suffering). Special Interrogatories: Was defendant Nicolas Nieves negligent in one or more of the ways claimed by the plaintiff as stated to you in these instructions? "Yes." Was the negligence of Nicolas Nieves a proximate cause of George Harris' injuries and death? "Yes." |
| Judge: | Patrick F. Lustig (IL Cook-Law) |
| Pltf Atty(s): | James D. Montgomery, Jr. and John K. Kennedy of Cochran, Cherry, Givens, Smith & Montgomery DEMAND: $6,900,000 ASKED: $18,880,000 |
| Deft Atty(s): | Alton C. Haynes, Mark G. Poulakidas and Brian P. O'Neill of Haynes, Studnicka, Kahan, O'Neill & Poulakidas for all defts (Zurich Excess Casualty) OFFER: $4,000,000 - $5,000,000 (indicated) |
| Pltf Medl: | Dr. James Doherty (Trauma Surgeon) |
| Pltf Expert(s): | John Goebelbecker (Accident Reconstruction), Michael J. Williams (Trucking Safety) and Malcolm S. Cohen, Ph.D. (Economist) |

July 10, 2009, George Harris was a passenger seated in the third row of a 2004 Chevy Ventura van returning home from work at Union Pacific Railroad with five other carpoolers. The van was traveling southbound on the Dan Ryan Expressway (Interstate 90/94) in the local lanes just north of 63rd St. during the Friday afternoon rush hour when it came to a standstill at 4:36 pm due to traffic congestion just before the split to the Skyway entrance. The van was in the third lane from the left; the two left lanes led into the Skyway entrance 1200 feet ahead. Deft Nieves had been traveling behind the van while driving a flatbed tow truck transporting two vehicles. When Nieves saw the traffic stopped ahead in his lane (lane 3), he decided to move to the lane on his left (lane 2), allegedly in order to jump in front of lane 3 traffic with a plan to re-enter lane 3 before the Skyway split. Nieves sped up, increasing his speed to 48 mph, in order to change into lane 2 where the traffic was moving fast. As he started to move to his left to lane 2, he claimed a "dark car" jumped from lane 3 behind him to lane 2 and then sped up beside him, forcing him to abort his lane change. As he straightened his truck in lane 3, he saw the stopped van and hit his brakes, but was unable to stop in time and plowed into the rear of the van. The force of the impact left the tow truck embedded in the back of the van with 3.5 feet intrusion. The third row of the van disappeared, leaving Harris pinned between the hood of the tow truck and the roof of the van, gasping for air. Harris M-40 was taken to Christ Hospital, where he was diagnosed with a cervical spine subluxation at the C-1 level, which was described by the trauma surgeon as an "internal decapitation." He also suffered a comminuted fracture of the left fibula, a broken rib, fractured clavicle, fractured hip wing at S-1, and bilateral transverse fractures at S-3. Harris died 4.5 hours later, survived by his wife and two children ($1,254,826 lifetime LT as union machinist for Union Pacific Railroad, $339,381 loss of household services). Nieves was employed by deft E & R Towing, a wholly owned subsidiary of deft United Road Towing. Pltf contended Nieves acted in the scope of his employment and/or agency with the corporate defts when he drove too fast for conditions, attempted an improper lane change, and failed to maintain proper distance from the vehicle ahead. Pltf's accident reconstruction expert testified Nieves' speed was approximately 25 mph at impact. Pltf's counsel reports that defts admitted agency against United to cause the dismissal of a negligent entrustment claim against

United, as the negligent entrustment claim would have enabled pltf to introduce evidence of M-26 Nieves' negative driving history. The defense argued Nieves' attempted lane change was lawful, the driver of the unidentified dark car who cut Nieves off was the sole proximate cause of the crash, and a dark car was visible in post-occurrence scene photos. The crash gave rise to nine personal injury claims, including four consolidated lawsuits. All other claims and suits settled prior to this trial, including a $14 million settlement with another van passenger (M-59 Jerry Powers) who was rendered a T-4 paraplegic (09L-8948).

(c) 2014 Law Bulletin Publishing Company

19-Aug-2014 10:53

## MEDICAL MALPRACTICE–DEATH FROM UNDIAGNOSED BOWEL OBSTRUCTION
(13 N/2) *Estate of Ramona Sue Yates, deceased v Dr. Daniel Doolittle, Legatus Emergency Services LLC* 09L-36 Tried Nov. 5-18, 2013 (12F)

| | |
|---|---|
| Verdict: | $2,439,544 v both defts ($2,320,182 pecuniary loss; $110,000 survival pain & suffering; $9,362 funeral and burial expenses). |
| Judge: | Brad Bleyer (IL, Williamson 1st Jud Cir) |
| Pltf Attys: | R. Courtney Hughes of *Hughes Law Firm* (Carbondale) and Paul G. Schoen of *Schoen, Walton* (East St. Louis) |
| Deft Attys: | Kim Roger Luther and Jessica A. Powers of *Luther & Associates* (St. Louis, MO) for both defts Offer: none |
| Pltf Expert: | Dr. Gary B. Harris (Emergency Medicine) |
| Deft Experts: | Dr. David A. Talan (Emergency Medicine), Dr. Philip Schauer, Cleveland Clinic, 9500 Euclid Ave., Cleveland, OH (216-444-4794) (Bariatric Surgeon) and Dr. Christine Menias, Mayo Clinic Arizona, 13400 E. Shea Blvd., Scottsdale, AZ (480-301-8442) (Radiologist) for both defts |

March 10, 2007, Ramona Sue Yates presented to the emergency room at Memorial Hospital of Carbondale with complaints of severe back and abdominal pain. Deft ER physician Daniel Doolittle (employed by deft Legatus Emergency Services) failed to diagnose or even suspect that she was suffering from a bowel obstruction and internal hernia. Two years earlier, F-47 Yates had undergone gastric bypass surgery, and bowel obstruction is a known complication for patients following the weight-loss surgery. Dr. Doolittle reportedly misdiagnosed her as having back spasms and had her admitted for observation. As a result, Yates died from the bowel obstruction the next day, March 11, 2007. She was survived by her husband and an adult son, and was employed as a nurse at a mental health facility. The estate contended Dr. Doolittle was negligent in failing to order appropriate testing and consultations with specialists. The jury deliberated approximately two hours.


## DEFT TURNING–MID-BLOCK LEFT TURN INTO HIGHLAND PARK GAS STATION
(13 N/3) *Janet Spahn v Fidel Sarmiento-Vazquez* 12AR-1424 Tried Nov. 4, 2013 (1B)

| | |
|---|---|
| Verdict: | $3,792 after 45% off $6,895 (arbitration award was $15,397). |
| Judge: | Diane E. Winter (IL, Lake 19th Jud Cir) |
| Pltf Atty: | Charles W. Smith of *Smith & LaLuzerne* (Waukegan) Demand: $15,000 Asked: $31,895 - $41,895 |
| Deft Atty: | Cindy M. Ekstam of *Parrillo, Weiss* (Chicago) (Safeway) Offer: $7,500 |
| Pltf Medl: | Dr. Joseph T. Alleva (Rehab/Physical Medicine) |

April 1, 2011, pltf was driving southbound on Skokie Valley Road in Highland Park, approaching the intersection at Lake Cook Road, when oncoming northbound deft made a left turn to enter a gas station parking lot, causing a collision. Pltf F-60 quality assurance manager contended she suffered an aggravation of her pre-existing neck injury and prior cervical fusion surgery ($6,895 medl. bills). The defense denied deft M-26 was negligent and disputed the extent of pltf's injury.


## DEFT TURNING LEFT–DEFT SAYS HE WAS STOPPED WHEN HIT BY ONCOMING PLTF
(13 N/4) *Amparo Mendoza v Majed Salem Ahmad* 11AR-2366 Tried Nov. 18, 2013 (1B)

| | |
|---|---|
| Verdict: | Not Guilty |
| Judge: | James D. Orel (IL, Du Page 18th Jud Cir) |
| Pltf Attys: | Terry M. Lachcik and Phillip W. Rehani of *Daniel E. Goodman LLC* (Rosemont) Demand: $14,000 Asked: $20,000 |
| Deft Atty: | Kelly M. Olivier of *Parrillo, Weiss* (Chicago) Offer: $2,700 |

Oct. 20, 2009, pltf contended she was traveling through an intersection on a green light when deft's oncoming vehicle made a left turn and struck the front driver's side of her vehicle, causing a heavy impact and soft tissue injuries. Deft maintained he had remained stopped in the middle of the intersection the entire time while waiting for traffic to clear, denied he turned into pltf, and claimed pltf hit him. The defense argued deft was stopped at the time of the impact and pltf was not injured in the collision.

Published by Jury Verdict Reporter, a Division of Law Bulletin Publishing Co., 415 N. State St., Chicago IL 60654. Phone 312-644-7800. Facsimile 312-644-5990. Internet www.lawbulletin.com. Annual Subscription rate $290. © Law Bulletin Publishing Co., 2014.



ᴬᴄᴄᴇꜱꜱPʟᴜꜱ®

**Cook County & Illinois**

# JURY VERDICT REPORTER

**Publication: Cook County Jury Verdict Reporter Published: 1/3/2014**

(FFF 12/1)    MEDICAL MALPRACTICE--ASTHMA ATTACK LED TO HYPOXIC BRAIN DAMAGE, DEATH (12F)

*Estate of Georgia Tagalos, deceased v Sisters of St. Francis Health Services Inc., d/b/a St. James Hospital & Health Centers - Olympia Fields Campus, Dr. Julie Mills, D.O., Dr. Perry Marshall, D.O.* 08L-5238 Tried Nov. 14-25, 2013

| | |
|---|---|
| Verdict: | $4,700,000 v Sisters of St. Francis Health Services Inc. d/b/a St. James Hospital & Health Centers - Olympia Fields Campus and Dr. Perry Marshall ($4,500,000 pecuniary loss/loss of society; $200,000 survival pain & suffering); Not Guilty v Dr. Julie Mills. |
| Judge: | Lorna E. Propes (IL Cook-Law) |
| Pltf Atty(s): | Christopher T. Hurley and Mark R. McKenna of Hurley, McKenna & Mertz$10,000,000 policy withdrawn, $1,000,000 policy withdrawn ASKED: $14,000,000 |
| Deft Atty(s): | Dina L. Torrisi and Edna L. McLain of HeplerBroom LLC for Sisters of St. Francis Health Services Inc., St. James Hospital & Health Centers - Olympia Fields Campus, Mills (Hills Insurance) OFFER: none; Robert P. Vogt of Weldon-Linne & Vogt for Marshall (EPIC) |
| Pltf Medl: | Patrick Gericke (Paramedic) |
| Deft Medl: | Dr. John Dybis, D.O. (Trauma Surgeon) and Dr. David Baker (Internist) for all defts |
| Pltf Expert(s): | Dr. Richard M. Sobel (Emergency Medicine) and Dr. Alan Leff (Pulmonologist) |
| Deft Expert(s): | Dr. James Walter (Emergency Medicine) for Sisters of St. Francis Health Services Inc.; Dr. Timothy Rittenberry (Emergency Medicine) and Dr. Jeffrey Huml (Pulmonologist) for Marshall |

July 9, 2006, Georgia Tagalos (F-49) was driving on I-57 near Matteson when she suffered an asthma attack and her son called 911. Matteson Fire Dept. EMTs administered oxygen and Albuterol, and transported her to the emergency room at St. James Hospital in Olympia Fields. After arriving at the hospital at 1:45 pm, Tagalos suddenly began grasping her throat and was unable to speak. It took at least seven minutes before she was seen by an ER physician, when attending ER physician Marshall told 4th-year resident Mills to go to the patient's examination room and prepare for intubation. Tagalos passed out at 1:56 pm and Dr. Mills attempted rapid sequence intubation without using the paralyzing drugs needed to eliminate a gag reflex, contrary to the hospital's written policy. Two intubation attempts failed and Tagalos began vomiting profusely. Between 2:01 and 2:11 pm, Dr. Marshall, another ER physician, and an anesthesiologist all made four more unsuccessful intubation attempts. By the time Dr. Marshall asked a trauma surgery resident to perform a cricothyrotomy (emergency throat incision to pass a tube to the lungs to provide oxygen), Tagalos had no pulse and an oxygen saturation level of zero. After the emergency cricothyrotomy was performed at 2:11 pm, Tagalos' vital signs returned to normal. However, she had suffered hypoxia after being pulseless for nearly 17 minutes and was declared brain dead. Tagalos was removed from life support on July 12, 2006 (survived by husband and one adult son). The estate contended the hospital's ER nurse was negligent for failing to call a code when Tagalos arrived at the ER, Dr. Marshall and Dr. Mills were negligent in waiting seven minutes to attend to Tagalos when she was in severe respiratory distress, Dr. Mills was negligent in attempting to intubate without medicating to prevent gag reflex, Dr. Marshall was negligent in allowing six unsuccessful intubation attempts on a patient without oxygen before seeking a cricothyrotomy - a well-known emergency procedure utilized by emergency physicians to establish an airway when intubation is unsuccessful, and Marshall and Mills were apparent agents of the hospital. The defense maintained Tagalos was obese and a pack-per-day cigarette smoker with poorly treated asthma which placed her at high risk for sudden death from asthma, her lethal asthma caused an inability to exhale building carbon dioxide in her lungs which led to respiratory acidosis and cardiac arrest, and defts' care complied with the standard of care and in no way caused her unavoidable death. The defense for Dr.

Marshall argued cricothyrotomy is a rare and dangerous procedure of last resort, it was appropriate to make multiple intubation attempts, and anesthesiologists are airway experts so the consulting anesthesiologist's failure to intubate proved the patient's anatomy made intubation impossible. The defense for the hospital denied the ER nurse failed to call for help when the patient arrived at the hospital and denied Marshall and Mills were apparent agents of the hospital.

(c) 2014 Law Bulletin Publishing Company

19-Aug-2014 10:53



**Cook County & Illinois**

# JURY VERDICT REPORTER

**Publication: Cook County Jury Verdict Reporter Published: 1/17/2014**

(FFF 14/1)     MEDICAL MALPRACTICE--MOTHER DIES FROM MASSIVE CHILDBIRTH
               HEMORRHAGE (12L)

*Estate of Karen Lopez, deceased v University of Chicago Hospital, Dr. Mahmoud A. Ismail, VHS of Illinois Inc.,
d/b/a MacNeal Hospital, Dr. Mukundini Mehta 09L-12356 Tried Nov. 8-22, 2013*

| | |
|---|---|
| Verdict: | $15,550,000 v University of Chicago Hospital, Dr. Mahmoud Ismail and Dr. Mukundini Mehta ($12,000,000 pecuniary loss; $1,000,000 pain & suffering; $1,800,000 loss of normal life; $750,000 disfigurement); Not Guilty v VHS of Illinois Inc. d/b/a MacNeal Hospital. |
| Judge: | James P. Flannery, Jr. (IL Cook-Law) |
| Pltf Atty(s): | Keith A. Hebeisen and Sarah F. King of Clifford Law Offices DEMAND: $9,000,000 ASKED: $25,000,000 |
| Deft Atty(s): | William V. Johnson and Jonathan B. Blakley of Johnson & Bell for University of Chicago Hospital, Ismail (SELF-INSURED) OFFER: UoCH $100,000; Carmel M. Cosgrave and Colin P. Gainer of SmithAmundsen for VHS of Illinois Inc., MacNeal Hospital (Volunteer Insurance) OFFER: MH $200,000; James A. Christman and Caroline E. Carlson of Edwards, Wildman, Palmer for Mehta (ISMIE) OFFER: MM $1,000,000 |
| Pltf Expert(s): | Dr. Edwin Guzman of St. Peter's University Hospital, 254 Easton Ave., New Brunswick, NJ (732-745-8549) (Maternal & Fetal Medicine), Dr. Nathan Hirsch, 7300 SW. 62nd Place, South Miami, FL (305-665-1133) (Ob/Gyn), Dr. John (Hans) W. Schweiger (Anesthesiologist), Dr. Shaku Teas (Pathologist) and Charles Linke, Ph.D. (Economist) |
| Deft Expert(s): | Dr. Rudy Sabbagha (Ob/Gyn) for University of Chicago Hospital, Ismail; Dr. Philip Samuels of Ohio State University Wexner Medical Center, 410 W. 10th Ave., Columbus, OH (614-293-2222) (Maternal & Fetal Medicine) for MacNeal Hospital; Dr. Michael Hussey (Maternal & Fetal Medicine) for Mehta |

Karen Lopez, age 33, presented to UC Hospital for preterm labor at 28 weeks gestation on Dec. 27, 2007. She had a history of a previous C-section, vaginal bleeding, and abdominal cramping throughout her pregnancy. On Dec. 28, deft maternal fetal medicine specialist Ismail allegedly misinterpreted an ultrasound and reported the placenta was located posterior fundal (rear top of uterus) with no evidence of previa (covering the cervix), when in fact the placenta was in the lower part of the uterus near the cervix with a potentially deadly abnormality called placenta percreta (a/k/a placenta accreta) in which the placenta invades the uterine wall. On Feb. 1, 2008, Karen was 34 weeks pregnant when she was admitted to MacNeal Hospital for kidney stones, where she experienced significant bleeding and went into labor. Her obstetrician, deft Dr. Mehta, proceeded with a C-section on Feb. 2 without first performing any additional imaging. After making the abdominal incision, Dr. Mehta noted the presence of a 3-4 inch lesion extending from the right broad ligament into the lower transverse portion of the uterus. He failed to recognize the lesion was a placenta percreta, which would have required stopping the surgery, calling for extra surgeons, and preparing to do a hysterectomy with additional blood products immediately available for anticipated massive bleeding. Instead, Dr. Mehta did the C-section with only two units of blood (1000 ccs) available in the operating room. After the baby was delivered, only a portion of the placenta separated. Dr. Mehta forcefully pulled on the remainder of the placenta to remove it, causing a massive hemorrhage to occur. Karen's massive blood loss (8000 ccs) led to DIC, shock, acute renal failure, and ischemic arms and legs with gangrene. Karen died on Feb. 8, 2008, survived by her husband and two children ($1,883,569 LT as high school teacher). The estate asserted with proper diagnosis and preparation, the mortality rate for placenta percreta is virtually zero. Dr. Ismail claimed the placenta location was accurately reported. Dr.

Mehta contended she would have treated the patient differently if she had been aware of the defect, she had no reason to be concerned about placenta percreta because the placenta was reported as posterior fundal, she did not pull the placenta with any force, and the placenta was manually removed in accordance with the standard of care. MacNeal and Mehta agreed Mehta was not an actual agent or employee of MacNeal, but rather was a solo practitioner who had treated the patient for eleven years. Defts further maintained the sole proximate cause of death was an amniotic fluid embolism, which was allegedly due to a severe allergic reaction. The jury deliberated less than six hours and answered two special interrogatories, finding Dr. Ismail was negligent and a proximate cause of Karen's death, and finding Karen did not know nor should she have known that Dr. Mehta was not an agent or employee of MacNeal Hospital.

(c) 2014 Law Bulletin Publishing Company

19-Aug-2014 10:53



**Publication: Cook County Jury Verdict Reporter Published: 4/4/2014**

(FFF 25/1)    <u>WORK INJURY--FATAL FALL ONTO TARMAC AT U.S. MILITARY AIR BASE IN
             KUWAIT (6)</u>

*Estate of John Bruce, deceased v CAV International Inc.* 10L-13818 Tried Feb. 3-14, 2014

| | |
|---|---|
| Verdict: | $6,651,060 after 10% off $7,390,067: Survival Action $790,067 ($343,242 medical expenses; $302,500 loss of normal life; $144,325 disfigurement; $0 conscious pain & suffering from time of fall to impact with tarmac); Wrongful Death $6,600,000 ($2,200,000 loss of society; $4,400,000 grief, sorrow, and mental suffering). |
| Judge: | Patrick F. Lustig (IL Cook-Law) |
| Pltf Atty(s): | Timothy J. Cavanagh, Stacey Feeley Cavanagh and Benjeman L. Nichols of Cavanagh Law Group DEMAND: $8,000,000 ASKED: $20,000,000 |
| Deft Atty(s): | Larry S. Kaplan and Susan J. Russell of Kaplan, Massamillo & Andrews (AIG) OFFER: $3,500,000 |
| Pltf Expert(s): | Anand Kasbekar, Ph.D. of Visual Sciences Inc., P.O. Box 90335, Raleigh, NC (919-782-3030) (Mechanical Engineer), Robert Earl, Brownburg, IN (317-500-2688) (Baggage Handling) and Dr. <u>Jerry Bauer</u> (Neurosurgeon) |
| Deft Expert(s): | Dr. <u>Dan J. Fintel</u> (Cardiologist) and James M. Miller, Ph.D. of J. M. Miller Engineering Inc., 2392 Fuller Court, Ann Arbor, MI (734-662-6822) (Human Factors) |

October 9, 2009, ramp serviceman John Bruce was employed by United Airlines and working at Al Mubarak Air Base in Kuwait, handling a military charter flight wherein United transported U.S. troops to the Middle East. The air base was operated by deft CAV International, a South Carolina corporation contracted by the U.S. government. After the UAL Boeing 747 airplane landed at 4:00 a.m., John's job was to enter the plane's front cargo pit by walking up a belt loader and unstrapping luggage. Military personnel would then begin unloading the baggage. As John exited the cargo pit back onto the belt loader, he grabbed the safety handrail to safely walk down. However, the operator of the belt loader, CAV employee Jesse Perrigo, suddenly lowered the handrail, which was the loader's only fall protection device. As a result, John M-64 fell head-first onto the concrete pavement twelve feet below. He sustained a catastrophic brain injury which required emergency craniotomy surgery, and also suffered spinal injuries. John was subsequently transported back to Chicago via air ambulance but never regained consciousness and died six days later at Northwest Community Hospital on October 15, 2009 ($343,242 medl., no lost income claim submitted). John was survived by his wife of 29 years and two sons; he also had three children from a previous marriage but they had been estranged and their claims were withdrawn at trial. The defense denied liability and blamed John for his accident, contending he should have yelled out that he was getting onto the belt loader. However, Perrigo testified that he was wearing ear plugs because the noise on a tarmac is significant, the policy was to rely on visual communication, he knew John was in the cargo pit and would normally leave it before the baggage was downloaded, and he never got visual confirmation before he lowered the handrail. Perrigo claimed he was paying attention but four military personnel who were eyewitnesses testified (via videotape evidence depositions) that Perrigo had his back turned and was laughing/joking with troops when he lowered the handrail. The defense also presented a cardiologist expert who testified that John had a prior stent surgery in 2004 and was not in good health due to high blood pressure, therefore shortening his life expectancy so he likely would not have lived until age 73. Two former co-defts, Boeing Co. and NMC-Wollard Inc. (manufacturer of the belt loader), settled out prior to trial for $50,000 each, so the verdict is subject to a setoff of $100,000. The jury reportedly deliberated 5 hours.

(c) 2014 Law Bulletin Publishing Company



***AccessPlus® Jury Verdict Case Details***

**ᗄccessPlus®**

Cook County & Illinois

# JURY VERDICT REPORTER

**Publication: Cook County Jury Verdict Reporter Published: 8/15/2014**

**(FFF 44/1)** MEDICAL MALPRACTICE--SUBSTANDARD NURSING CARE BLAMED FOR DEATH (12O)

*Estate of William J. Wachholz, deceased v Elmhurst Memorial Hospital* 10L-1649 Tried Jun. 2-18, 2014

| | |
|---|---|
| Verdict: | $4,000,000 ($2,750,000 pecuniary loss; $850,000 survival pain & suffering; $400,000 emotional distress). Special Interrogatory: Was Dr. Joao Ubatuba's decision not to take Mr. Wachholz back to surgery when he visited the bedside at approximately 7:00 pm on November 21, 2008, the sole proximate cause of Mr. Wachholz's suffering and death? "No." |
| Judge: | Elizabeth M. Budzinski (IL Cook-Law) |
| Pltf Atty(s): | Bradley M. Cosgrove and Marta M. Kowalczyk of Clifford Law Offices DEMAND: none  ASKED: $13,500,000 |
| Deft Atty(s): | Robert H. Summers, Jr. and Daniel J. Pylman of Cassiday Schade (SELF-INSURED) OFFER: none |
| Pltf Medl: | Dr. Edyta Czarnowska Leicht (Anesthesiologist), Dr. Barbara Potaczek (Internist), Dr. Ada Rahn (Internist) and Dr. Joao Ubatuba (Thoracic Surgeon) |
| Deft Medl: | Dr. John Alexander DaMergis (Internist) |
| Pltf Expert(s): | Deborah Dias-Mills, R.N., 636 Broderick St., San Francisco, CA (415-409-0231) (Nursing) and Dr. Heather W. Brien, 361 Hospital Road, #227, Newport Beach, CA (949-646-6212) (Vascular Surgeon) |
| Deft Expert(s): | Marianne Curia, Ph.D. of University of St. Francis, Leach College of Nursing, 500 Wilcox St., Joliet, IL (815-740-3536) (Nursing) |

William Wachholz underwent a carotid endarterectomy procedure at Elmhurst Memorial Hospital on November 21, 2008. During the evening and overnight hours following the surgery, William M-51 developed signs and symptoms of a postoperative neck hematoma which the hospital nursing staff failed to report to a physician. The hematoma was likely caused by postop bleeding from the incision in the artery, a known complication of the procedure. From 7:20 pm to 4:30 a.m., a period of over nine hours, the nurses responsible for William's postop care and treatment allegedly failed to report changes in his condition to a physician, including difficulty swallowing related to neck swelling, impaired swallowing, increasing neck swelling, unclear/gargled speech, diminished lung sounds, a new finding of sputum, and the use of a Yankauer suction tube. The nurses also allegedly failed to perform neck girth assessments or completely mark the swelling to objectively measure the increasing swelling. At 4:45 a.m. on November 22, William's airway became compromised due to the untreated postop hematoma. He began consciously suffocating, resulting in full cardiopulmonary arrest and death (survived by his wife and three adult daughters). William's treating physician, Dr. Ada Rahn, determined the cause of death to be hypoxia, airway obstruction, and a postop neck hematoma that was present for twelve hours. No autopsy was performed. Pltf's nursing expert asserted that Elmhurst Memorial's nurses deviated from the standard of care by failing to objectively measure the swelling, failing to contact a physician, and failing to request that a physician come to the patient's bedside. The treating vascular surgeon who had performed the endarterectomy procedure, Dr. Joao Ubatuba, testified that if the nurses had contacted him and informed him of the changes in William's condition, he would have had a physician see the patient. Pltf's vascular surgery expert opined that if the nursing staff had reported the worsening symptoms and swelling, the hematoma would have been timely diagnosed and treated and the patient would not have died. The defense denied the nurses deviated from the standard of care, denied there were any changes in the patient's condition before 4:30 a.m., denied

there was any need to contact a physician to assess the patient, and contended the hematoma was a sudden event. The defense further argued that William had a reduced life expectancy due to his pre-existing co-morbidities. Dr. Ubatuba settled out for $1 million during trial. The jury deliberated eleven hours over two days.

(c) 2014 Law Bulletin Publishing Company

19-Aug-2014 10:53



ACCESSPLUS®

**Cook County & Illinois**
# JURY VERDICT REPORTER

**Publication: Cook County Jury Verdict Reporter Published: 1/16/2004**

(VV 14/1)    MEDICAL MALP.--PATIENT COLLAPSED AND DIED SHORTLY AFTER
             DISCHARGE (12H)

*Estate of Ella Frazier, deceased v Dr. Donald Nash* 99L-14464 Tried Nov. 17-24, 2003

| | |
|---|---|
| Verdict: | $2,500,000 |
| Judge: | Cheryl A. Starks (IL Cook-Law) |
| Pltf Atty(s): | Michael R. Panter and Charles L. Cannon, III of Michael R. Panter & Associates DEMAND: $1,750,000 ASKED: $5,000,000 |
| Deft Atty(s): | Kevin J. Glenn of Pretzel & Stouffer (Doctor's Company) OFFER: none |
| Pltf Expert(s): | Dr. Bruce Robert Leslie (Internist) |
| Deft Expert(s): | Dr. John C. Sabbia (Internist) |

Deft surgeon admitted Ella Frazier (F-47) to Gottlieb Memorial Hospital on July 20, 1998, for a thyroidectomy revision, after half of her thyroid had been removed three weeks earlier. Surgery went smoothly and Dr. Nash approved patient's discharge from hospital after seeing her the next morning. Over the course of the day, Ella had a low grade fever, tachypnea and some dyspnea when walking. Hospital nurse testified that she reported this to Dr. Nash in two telephone calls, but Dr. Nash claimed to have received only the first call. Ella was discharged in the late afternoon. Her daughter drove her home, where she collapsed and died (survived by twin children aged 26). Autopsy showed death was due to a large saddle pulmonary embolism and that she also had smaller emboli for some time prior. Estate contended that deft was negligent for failing to test for, diagnose and treat pulmonary embolism. Defense argued that the symptoms were normal following surgery and were too soft to consider pulmonary embolism. Post-trial motions are pending.

(c) 2010 Law Bulletin Publishing Company

22-Oct-2010 12:18



**Cook County & Illinois**

# JURY VERDICT REPORTER

**Publication: Cook County Jury Verdict Reporter Published: 5/11/2007**

(YY 30/1)     MEDICAL MALPRACTICE--DEATH FROM UNDIAGNOSED PULMONARY
              EMBOLISM (12H)

*Estate of Tajuana Baker, deceased v Sisters of St. Francis Health Services Inc., d/b/a Olympia Fields Regional Osteopathic Medical Center, n/k/a St. James Hospital & Health Centers, Dr. Sophie Simeakis, D.O., Dr. Ellen Hennecke, D.O. 03L-1370 Tried Feb. 28-Mar. 15, 2007*

| | |
|---|---|
| Verdict: | $3,000,000 v St. James Hospital ($3,000,000 pecuniary loss; $0 survival pain & suffering; $0 disability); Not Guilty v Dr. Sophie Simeakis and Dr. Ellen Hennecke. |
| Judge: | John B. Grogan (IL Cook-Law) |
| Pltf Atty(s): | Keith A. Hebeisen and Jeffrey J. Kroll of Clifford Law Offices DEMAND: $7,000,000  ASKED: $5,600,000 - $7,500,000 |
| Deft Atty(s): | Catherine Coyne Reiter of Price, Tunney & Reiter for St. James Hospital & Health Centers (Hills Insurance) OFFER: SJH&HC $1,000,000; William C. Anderson, III of Anderson, Rasor & Partners for Simeakis (ISMIS) OFFER:  none; Richard H. Donohue of Donohue, Brown, Mathewson & Smyth for Hennecke (Doctor's Company) OFFER:  none |
| Pltf Expert(s): | Dr. Richard Zane (Emergency Medicine), Dr. Jack Hirsh (Hematologist), Dr. Ricardo Cajulis of Lake Forest Hospital, 101 N. Waukegan Rd., #1250, Lake Bluff, IL (847-295-5848) (Pathologist) and Roger Skurski (Economist) |
| Deft Expert(s): | Dr. James Walter (Emergency Medicine) and Dr. Jeffrey Kopin (Internist) for St. James Hospital & Health Centers; Dr. John Zautcke (Emergency Medicine) for Simeakis; Dr. Diane Homan (Family Practice) for Hennecke |

Jan. 12, 2000, Tajuana Baker presented to the emergency room at St. James Hospital's Olympia Fields Campus shortly before midnight with complaints of severe chest pain and shortness of breath. Chest x-rays were abnormal and showed patchy infiltrates. She had recently had an upper respiratory infection for which her doctor, deft Hennecke, had prescribed antibiotics over the phone on Dec. 30. Family practitioner Hennecke had also previously treated Tajuana for deep vein thrombosis from Jan. 1997 to Jan. 1998. At the emergency room, F-48 Tajuana was evaluated by Dr. Simeakis, an independent contractor E/R physician, and was given a provisional diagnosis of pneumonia. Although not noted in the records, Simeakis testified she included pulmonary embolism in her differential diagnosis because of the history of DVT. Simeakis ordered intravenous antibiotics and Toradol, a strong anti-inflammatory. Simeakis wanted to admit Tajuana into the hospital for further evaluation and treatment, and she called Dr. Hennecke at home to discuss admitting her. Hennecke told Simeakis to call the hospitalist service which was now handling all admission decisions pursuant to an arrangement with Midwest Physicians Group (employer of both doctors). Simeakis called Dr. Isaac Kirstein, D.O., a 3rd-year resident on the hospitalist service, to have him evaluate Tajuana for admission. After Simeakis left the hospital at 6:30 a.m., Kirstein evaluated the patient around 7 a.m., diagnosed pleuritic chest pain due to pneumonia or rib fracture, concluded there was no evidence of thrombosis or pulmonary embolism, and decided to send her home. Kirstein testified he phoned Dr. Theresa Matzura D.O., the attending hospitalist (also an employee of Midwest), who would not be coming to the hospital until after 8 a.m., and she cleared his decision to not admit Tajuana into the hospital. Matzura said she had no memory of the conversation with Kirstein. Tajuana went home and saw Dr. Hennecke at her office the next day, Jan. 14, at which time Hennecke noted her condition was much improved and sent her home with instructions to call if her symptoms worsened. On Jan. 17, Tajuana called Hennecke's office to report her chest pain was now located in a different area, and an appointment was set up for Jan. 19, 2000. However, Tajuana was found unresponsive at home on the morning of Jan. 19, and she was pronounced dead at St. James after unsuccessful resuscitation attempts. Autopsy

revealed a massive pulmonary embolism as the cause of death. She was survived by her husband and two adult children ($1,300,000-$1,400,000 LT as telecommunications specialist and value of household services). Estate contended Tajuana was at moderate to high risk of pulmonary embolism given her history of DVT, the standard of care required further diagnostic testing and/or inpatient hospitalization with Heparin therapy, and defts should have performed a V/Q scan. Defense maintained it was reasonable to diagnose pneumonia, given the recent respiratory infection and the patient's normal vital signs, and a V/Q scan would have been nondiagnostic. In special interrogatories, the jury found Simeakis and Hennecke were not apparent agents of the hospital, Matzura was an apparent agent, and Kirstein and Matzura were both negligent. Jury deliberated approximately 3 hours.

(c) 2010 Law Bulletin Publishing Company

22-Oct-2010 12:18



**Cook County Jury Verdict Reporter**

January 16, 2009
Issue 14
Volume AAA

COOK COUNTY

# JURY VERDICT REPORTER

## MEDICAL MALPRACTICE–ANESTHESIA INTUBATION ATTEMPTS CAUSED DEATH

(AAA 14/1) *Estate of Nellie Hood, deceased v Dr. Mario F. Magleo, Dr. Ruperto U. Buscaino, Noel G. Alcantara M.D. S.C., Holy Cross Hospital 05L-5414 Tried Nov. 17-Dec. 5, 2008 (12A)*

| | |
|---|---|
| Verdict: | $10,500,000 v Dr. Magleo, Dr. Buscaino and Noel G. Alcantara M.D. S.C. ($3,500,000 loss of society to each of two adult sons; $3,500,000 loss of society to husband); Not Guilty v Holy Cross Hospital. Special Interrogatories: Were Magleo and Buscaino independent contractors of Noel G. Alcantara M.D. S.C.? "No." Was Nurse Karalow's alleged negligence a proximate cause of Nellie Hood's injuries? "No." Two high/low agreements were in effect: $100,000 - $700,000 with Dr. Magleo and $300,000 - $900,000 with Dr. Buscaino. Also, former co-deft Dr. Dae Choi settled out for $975,000 just prior to trial. |
| Judge: | Deborah M. Dooling (IL Cook-Law) |
| Pltf Attys: | David R. Barry, Jr. and Kenneth T. Lumb of *Corboy & Demetrio* Demand: $600,000 - $2,400,000 high/low, $1,000,000 Asked: $7,000,000 + |
| Deft Attys: | Michael A. Code of *Lowis & Gellen* for Magleo (ISMIE) Offer: MFM $100,000 - $700,000 high/low; David C. Burtker of *Cunningham, Meyer* for Buscaino (ISMIE) Offer: RUB $300,000 - $900,000 high/low; Randall C. Monroe of *Brenner, Ford* for Noel G. Alcantara M.D. S.C. (ISMIE) Offer: none; Robert H. Summers, Jr. of *Hinshaw & Culbertson* for Holy Cross Hospital (CHRPP) Offer: HCH $100,000 - $300,000 high/low |
| Pltf Medl: | Dr. Dae Choi (Anesthesiologist) |
| Pltf Experts: | Dr. David I. Cullen (Anesthesiologist) and Mary Grace Hensell, R.N. (Nurse, Surgical) |
| Deft Experts: | Dr. Thomas Cutter (Anesthesiologist) for Magleo; Dr. Jesse Marymont, Evanston Hospital, 2650 Ridge Ave., #3905, Evanston, IL (847-570-2760) (Anesthesiologist) for Buscaino |

May 11, 2004, Nellie Hood went to Holy Cross Hospital for elective hip replacement surgery due to arthritis. Nellie F-61 was a retired registered nurse who had worked at Cook County Hospital for eighteen years. Because of a prior bad experience with the insertion of a breathing tube for general anesthesia, Nellie requested that she be given a spinal anesthetic for the hip surgery, which would not require the insertion of a breathing tube (a procedure known as intubation). After Nellie was brought into surgery, her anesthesiologist, Dr. Dae Choi, had trouble inserting a needle for the spinal anesthesia, so he decided to proceed with general anesthesia. Dr. Choi administered drugs that put the patient to sleep and paralyzed her, but was then unable to insert the breathing tube despite several attempts. He planned to breathe for her through a mask and let her wake up to breathe on her own, but deft Dr. Magleo then came into the room and decided to attempt the intubation. Dr. Magleo's attempts were also unsuccessful. Deft Dr. Buscaino then entered the operating room and tried to insert the breathing tube several times, but he also was unsuccessful. All of the attempts at inserting the tube caused the patient's airway tissues to swell shut, blocking off oxygen and causing cardiac arrest. Nellie was eventually resuscitated but suffered severe brain damage and died on May 31, 2004; she was survived by an estranged husband, from whom she had been separated since 1986, and two adult sons. The estate contended Nellie would have been fine if Dr. Choi had been allowed to let her wake up before further intubation attempts caused her airway to swell shut, and she likely would have been unharmed even after the airway closed if the deft doctors had taken measures to protect her airway and get oxygen into her lungs while waiting approximately fifteen minutes for a surgeon to arrive and perform a tracheostomy. Dr. Magleo and Dr. Buscaino were employed by Noel G. Alcantara M.D. S.C., which claimed they were independent contractors and denied responsibility for their actions. Pltf's last demand listed above included a $100,000-$700,000 high/low agreement from Magleo, $300,000-$900,000 high/low from Buscaino, $200,000-$800,000 high/low from Holy Cross Hospital, and $1,000,000 from Alcantara M.D. S.C. Pltf's counsel asked the jury to award $3.5 million to each son and whatever they thought was appropriate to the estranged husband.



**ᴀᴄᴄᴇssPʟᴜs**

**Cook County & Illinois**

# JURY VERDICT REPORTER

**Publication: Cook County Jury Verdict Reporter Published: 11/27/2009**

(BBB 7/1)     MEDICAL MALPRACTICE--DEATH BLAMED ON IMPROPER EMERGENCY ROOM
             TRIAGE (12F)

*Estate of Kathleen Duffy, deceased v Little Company of Mary Hospital & Healthcare Centers 06L-*
*1671 Tried Oct. 2-19, 2009*

| | |
|---|---|
| Verdict: | $4,000,000 |
| Judge: | Deborah M. Dooling (IL Cook-Law) |
| Pltf Atty(s): | John B. Kralovec, Andrew B. Tarnoff and Melissa K. McCracken of Kralovec, Jambois & Schwartz ASKED: $17,000,000 |
| Deft Atty(s): | Marilee Clausing and Mary Ellen Busch of Anderson, Rasor & Partners (SELF-INSURED) OFFER: none |
| Deft Medl: | Dr. James C. Miller (Internist) |
| Pltf Expert(s): | Dr. Adrian R. M. Upton (Neurologist) and Cheryl Randolph, R.N. (Nursing) |
| Deft Expert(s): | Dr. David Baldwin (Endocrinologist), Dr. John Ortinau (Emergency Medicine) and Laurie Carroll, R.N. (Nursing) |

May 17, 2005, Kathleen Duffy, who had Type I diabetes, was brought by paramedics to the emergency room at
Little Company of Mary Hospital in Evergreen Park with an extremely elevated glucose level of 1,752 (normal
range is 65 to 110). Pltf contended the emergency room nurses failed to properly triage the patient as "urgent"
and failed to properly monitor her physical condition with advance warning alarms when she was deteriorating
toward respiratory and cardiac arrest. As a result, F-45 Kathleen suffered a cardiopulmonary arrest in the
emergency room, resulting in irreversible brain damage; she died following the removal of life support on May
20, 2005 (survived by her husband and two children). The defense argued the patient was in severe diabetic
ketoacidosis upon arrival at the hospital, she coded 55 minutes after her arrival, there was simply not enough
time to correct her metabolic derangements, and her death could not have been prevented. Pltf's counsel notes
that the verdict was returned by eleven jurors following the dismissal of one juror during the second day of
deliberations after he informed Judge Dooling he had a professional relationship with the mother of an attorney
employed by the defense firm (Anderson, Rasor).

(c) 2010 Law Bulletin Publishing Company

                                                                    22-Oct-2010 12:18



ACCESSPLUS®

Cook County & Illinois

# JURY VERDICT REPORTER

**Publication:** Cook County Jury Verdict Reporter **Published:** 4/8/2011

(CCC 26/1)     MEDICAL MALPRACTICE--CHEMOTHERAPY DRUG CAUSED CANCER PATIENT'S
               DEATH  (12D)

*Estate of Phyllis Farissier, deceased v Northwest Oncology & Hematology S.C.* 09L-1720 (refiled from 05L-11491) Tried Jan. 24-Feb. 4, 2011

| | |
|---|---|
| Verdict: | $5,420,950 (Wrongul Death Claim: $4,742,325 loss of society, $13,260 funeral expenses; Survival Act Claim: $500,000 pain & suffering, $100,000 loss of normal life, $65,365 medical expenses). |
| Judge: | Richard J. Elrod (IL Cook-Law) |
| Pltf Atty(s): | John R. Wrona and Clinton J. Ind of Gardiner, Koch, Weisberg & Wrona DEMAND: none  ASKED: $6,678,625 |
| Deft Atty(s): | Michael T. Trucco and Daniel R. Shaffer of Stamos & Trucco (ISMIE) OFFER:  none |
| Pltf Medl: | Dr. Paul Sowray (Oncologist), Dr. Erol Yorulmazoglu (Oncologist), Dr. Edwin R. Priest (Oncologist), Dr. Elizabeth Schupp (Pulmonologist), Dr. Stephen Greenstein (Pulmonologist) and Dr. Lynwood Jones (Infectious Disease) |
| Deft Medl: | Dr. Robert D. Rosenbloom (General Surgeon) |
| Pltf Expert(s): | Dr. Peter H. Wiernik of St. Luke's-Roosevelt Hospital, 1000 Tenth Ave., Suite 11C-02, New York, NY (212-636-3338) (Oncologist), Dr. Robert Hyzy of University of Michigan, A. Alfred Taubman Healthcare Center, 1500 E. Medical Center Drive, #3916, Ann Arbor, MI (734-936-5201) (Pulmonologist) and Dr. Rodger MacArthur (Infectious Disease) |
| Deft Expert(s): | Dr. Sucha Nand (Oncologist), Dr. John P. Flaherty (Infectious Disease) and Dr. Steven R. White (Pulmonologist) |

Oct. 6, 2003, Phyllis Farissier went to deft Northwest Oncology & Hematology in Hoffman Estates to begin her fifth cycle of chemotherapy treatment for her Stage III-A-S Hodgkin's lymphoma. She was receiving the standard ABVD chemotherapy protocol, a four-drug combination which includes Bleomycin. The primary treating oncologist, Dr. Paul Sowray, was out of town on vacation, so the patient was seen by a covering oncologist, Dr. Erol Yorulmazoglu. Dr. Yorulmazoglu failed to check the results from a pulmonary function test performed two days earlier, a test which is routinely ordered to detect Bleomycin-induced lung injury before it becomes clinically apparent. Because he did not obtain the test results, he was unaware the test showed a decrease in pulmonary function attributable to an early mild Bleomycin-induced lung injury, which manifests in inflammation and then scarring of lung tissue and interferes with exchange of oxygen in the lung for carbon dioxide in the blood. Dr. Yorulmazoglu failed to withhold the Bleomycin from her chemotherapy combination that day. When F-53 Phyllis returned for her next chemotherapy appointment two weeks later on Oct. 20, 2003, with a two-week history of worsening shortness of breath, a different covering oncologist read the pulmonary function test results, appreciated the pulmonary function decrement, took her off the drug, and prescribed Prednisone. Despite receiving the appropriate steroid treatment, Phyllis died from severe progressive Bleomycin lung toxicity and respiratory failure five weeks later on Nov. 28, 2003 (survived by husband of 35 years and two adult children, $65,365 medl., $13,260 funeral/burial expenses). Pltf's oncology expert asserted the standard of care required that Northwest employee Yorulmazoglu obtain the pulmonary function tests, compare them to prior test results, diagnose Bleomycin lung toxicity, and withhold the drug from therapy on Oct. 6, 2003, and his deviation from the standard of care was a proximate cause of her death. Pltf's pulmonology expert opined the lung injury would likely have stabilized or improved with little or no permanency if the administration of Bleomycin had been withheld on Oct. 6, and this last administration put her over the edge and caused the lung injury to go from early and mild to severe, progressive, and fatal. The defense contended the standard of care

did not require Dr. Yorulmazoglu to obtain the test results because the test was ordered as a matter of routine, and stopping the Bleomycin was not required on Oct. 6 because the patient was not yet symptomatically short of breath, she did not have a cough, and her chest x-rays did not show inflammation that could be related to Bleomycin. The defense further claimed Bleomycin lung toxicity was not the cause of death and instead blamed Pneumocystis carinii pneumonia (PCP), which the patient developed in mid-November, as the cause of death. Pltf's infectious disease expert denied Phyllis died of PCP. The verdict exceeds deft's insurance policy limit of $2 million.

(c) 2014 Law Bulletin Publishing Company

19-Aug-2014 10:53



Cook County & Illinois

# JURY VERDICT REPORTER

**Publication: Cook County Jury Verdict Reporter Published: 7/1/2011**

(CCC 38/1)     MEDICAL MALPRACTICE--FAILURE TO DIAGNOSE AORTIC DISSECTION CAUSED DEATH (12H)

*Estate of Michael Hamilton, deceased v Excel Emergency Care LLC, Dr. Jose Almeida, St. James Hospital* 07L-6654 (refiled from 02L-11530) Tried May 2-12, 2011

| | |
|---|---|
| Verdict: | $3,767,792 v Excel Emergency Care LLC and Dr. Jose Almeida ($2,504,528 loss of society; $1,252,264 past and future loss of money, benefits, goods and services; $11,000 funeral and burial expenses). Verdict is subject to a $75,000 setoff from settlement with St. James Hospital. |
| Judge: | Richard J. Elrod (IL Cook-Law) |
| Pltf Atty(s): | David S. Jasmer of Jasmer Law Firm and James L. "Larry" Wright (Austin, TX) DEMAND: none  ASKED: $5,020,056 |
| Deft Atty(s): | Sheryl M. Arrigo and Timothy L. Hogan of Donohue, Brown, Mathewson & Smyth for Excel Emergency Care LLC, Almeida (A.P. Capital Insurance) OFFER:  none |
| Pltf Expert(s): | Dr. Robert L. Shuman, 701 E. 28th St., #101, Long Beach, CA (562-595-8646) (Cardiovascular Surgeon) and Stanley V. Smith, Ph.D. (Economist) |
| Deft Expert(s): | Dr. Robert Mulliken (Emergency Medicine), Dr. Axel Joob (Cardiothoracic Surgeon), Dr. Bruce Silver (Radiologist) and Dr. Gary L. Schaer (Cardiologist) for Excel Emergency Care LLC, Almeida |

May 15, 2001, Michael Hamilton was working as a paint factory supervisor at Behr Process Corp. in Chicago Heights when he began experiencing severe chest pains radiating to his stomach and back, profuse sweating, dizziness, and nausea. He was taken by ambulance to St. James Hospital in Chicago Heights, where he was seen by deft emergency room physician Almeida, an employee of Excel Emergency Care. Dr. Almeida failed to diagnose that Michael was suffering from an aortic dissection and sent him home three hours later with a diagnosis of resolved abdominal pain, with instructions to follow up with his doctor, rest, and drink liquids. Michael M-35 died at his Sauk Village home six days later from the aortic dissection on May 21, 2001; he was survived by a 2-year-old daughter ($1,252,000 lifetime LT). The estate contended Dr. Almeida failed to take an adequate history from the patient regarding the onset of the pain, failed to discover the severity of the pain at the time of its onset as well as the location and associated symptoms, failed to consider aortic dissection as a differential diagnosis, and failed to order a CT scan, preventing timely diagnosis and life-saving surgery. Pltf's counsel maintained that the pain with aortic dissection tends to be maximum at the onset due to tearing of the inner layer of the aortic wall and then can quickly taper off and stabilize for several days or weeks until it ruptures and causes sudden death. The defense argued Dr. Almeida appropriately worked up the patient for abdominal pain, the patient reported the pain had resolved so he was discharged and told to follow up with a doctor in 24 hours, and Almeida's care complied with the standard of care as aortic dissection is rare -- especially for patients in their 30s.

(c) 2014 Law Bulletin Publishing Company

19-Aug-2014 10:53